IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> JOHN CICERO HUGHES, <br><br> Defendant. | CR 18–38–M–DLC <br><br><br> ORDER |

Before the Court are Defendant John Cicero Hughes's Motion to Suppress Evidence from C&P Examination (Doc. 61) and Motion to Suppress Statements Based on *Miranda* (Doc. 65). As explained in this Court's Order of September 17, 2019, the Court will withhold judgment until trial regarding Hughes's Motion to Suppress Government's Compilation Exhibit (Doc. 63). (Doc. 72.) The Court held a hearing on the motions on September 23, 2019. Having considered the parties' briefs, supporting exhibits, and the evidence presented at the hearing, the Court denies the motions.

## BACKGROUND

The grand jury handed down a 20-count indictment against Hughes on June 28, 2018. (Doc. 2.) Hughes stands charged with one count of Health Care Fraud, seventeen counts of Theft of Government Money, one count of False Statements,

-1-

and one count of Social Security Disability Insurance Fraud. The government alleges that Hughes misrepresented the severity and scope of his disability in order to unlawfully take government benefits.

I.   **Summary of the Federal Agencies Involved**

Hughes, a veteran, receives healthcare from the Veterans Health Administration ("VHA") and benefits through the Veteran Benefits Administration ("VBA"). The VHA and VBA are both organizations under the umbrella of the Department of Veterans Affairs ("VA"). Hughes's receipt of benefits through the VBA is at the core of the criminal charges he faces. His receipt of healthcare services through the VHA is generally irrelevant to this criminal proceeding, but VHA medical providers were involved in classifying Hughes's level of disability at the direction of the VBA. In early 2018, the VBA downgraded Hughes's disability rating following a compensation and pension ("C&P") examination performed by VHA Family Nurse Practitioner Christine McCutcheon.

Independent from the VA but also relevant to this case is the VA Office of Inspector General ("OIG"), an oversight agency created by the Inspector General Act of 1978, Pub. Law 95-452, 5 U.S.C. App. § 3. The OIG investigates fraud and waste within the VA, and its agents have the "duty and responsibility . . . to conduct, supervise, or coordinate . . . activities carried out or financed by [the VA]

for the purpose of promoting economy and efficiency in the administration of, or preventing and detecting fraud and abuse in, its programs and operations . . . ." 5 U.S.C. App. 3 § 4(a)(4). In Hughes's case, the OIG conducted the criminal investigation, led by investigating agent David Huntoon, that led to the indictment in this case. Agent Huntoon shared information gathered during the criminal investigation with the VBA, triggering its review of Hughes's appropriate disability classification.

**II.     Hughes's Receipt of Benefits and the Agencies' Investigations**

In 2009, Hughes was rated as 100% disabled by VBA on the basis of his diagnosed multiple sclerosis. During the hearing on the motions to suppress, Agent Huntoon testified that at some point prior to October 2017, he received information that Hughes had been seen riding a motorcycle, which Huntoon viewed as inconsistent with the VBA's determination that his disability included the loss of use of both feet. The OIG opened a criminal investigation. It also shared information with the VBA, which in turn reviewed Hughes's file and discovered a treatment note from 2013 describing Hughes carrying his wheelchair in one hand and his cane in the other as he walked down the stairs of a VHA building.

In light of this evidence, the VBA began its own investigation into Hughes's level of disability for the purpose of ensuring that Hughes was receiving the appropriate level of benefits. In collaboration with the OIG,[1] the VBA scheduled a C&P exam for October 23, 2017. Agent Huntoon contacted the VHA provider who would conduct the examination, Nurse Practitioner McCutcheon, and requested her consent to record the examination. McCutcheon gave her consent, and Huntoon and OIG investigating agent Marcus Munn made arrangements to monitor and create a video and audio recording of the C&P exam.

Hughes canceled the exam and rescheduled it for November 15, 2017. However, he did not attend the rescheduled exam. On December 20, 2017, the VBA sent a letter to Hughes proposing that Hughes's disability rating from 100% to 70%, corresponding to a proposed reduction in monthly benefits from $7,702.12 to $1,566.48. (Doc. 67-3.) The VBA explained that the reduction was attributable, in part, to Hughes's failure to attend the scheduled C&P exam. It also notified

---

[1] There has been some disagreement, or perhaps simply confusion, between the parties regarding the OIG's level of involvement in scheduling and conducting the C&P exam. At the hearing, the Court heard testimony from Agent Huntoon and from Elizabeth Stuber, a supervisory veteran service representative within the VBA. Stuber was not actively involved in the events leading to Hughes's indictment, but her predecessor Melody Trainor was. In light of this testimony, the Court finds that the OIG played some role, however minor, in setting up the C&P exam; the VBA ordered the exam and handled its administration, and the OIG influenced that administration. Most notably, the OIG requested that the VBA use a VHA medical provider because Huntoon expected that it would be easier to record and monitor the C&P examination if the agency did not use an independent provider. However, the Court also finds that the VBA would have ordered the C&P exam regardless of the OIG's involvement in its implementation.

-4-

Hughes of his right to appeal the proposed revision of Hughes's disability rating. In response, Hughes sent a letter contesting the revision and stating that he had rescheduled his C&P exam for January 23, 2018.

Hughes attended the January 23, 2018 C&P exam. McCutcheon performed the exam, following the VBA's check-box disability benefits questionnaire specific to multiple sclerosis.[2] Agents Huntoon and Munn recorded the exam via audio and video, and they also watched the exam in real time. At issue here is whether the government may introduce evidence from the exam at trial.

## DISCUSSION

Hughes seeks suppression of evidence collected during the January 23, 2018 C&P Exam under two theories. First, he argues that the warrantless recording of the exam was an unconstitutional search, and the audio and video recordings therefore must be suppressed. Second, he contends that suppression of his statements made in response to McCutcheon's questions is warranted because: (1) he did not receive a *Miranda* warning; and (2) his statements were made involuntarily.

---

[2] As a result of McCutcheon's examination, Hughes's disability rating decreased, but to 90% rather than the 70% proposed.

## I. Motion to Suppress Evidence from C&P Examination (Doc. 61)

Hughes seeks suppression of "documentation, recordings, observations, and conclusions" from the January 23, 2018 C&P exam. (Doc. 62 at 2.) He argues that Agents Huntoon and Munn violated his Fourth Amendment right to freedom from unreasonable search and seizure by observing and recording the C&P exam. Hughes's argument falls under two general lines of reasoning: (1) the government did not comply with applicable regulations governing the sharing of veterans' personal health information; and (2) the government needed a warrant because the observation and recording of the C&P exam was an intrusion into his objectively reasonable expectation of privacy.

Certainly, the individual actors involved in the Hughes investigation are constrained by the Fourth Amendment. *See infra* note 5. "The Fourth Amendment applies . . . to government conduct motivated by 'investigatory or administrative purposes.'" *Doe ex rel. Doe v. Hawaii Dep't of Educ.*, 334 F.3d 906 (9th Cir. 2003) (quoting *United States v. Attson*, 900 F.2d 1427, 1403–31 (9th Cir. 1990)). Thus, while the relationship between the agencies involved provides helpful context, it is not particularly important to resolving the question of whether Hughes's constitutional rights were violated.

## A. Seizure

The Fourth Amendment guards individuals from unreasonable seizures. "For purposes of the Fourth Amendment, a seizure occurs when [a state actor], through some form of physical force or show of authority, restrains the liberty of a citizen." *United States v. Summers*, 268 F.3d 683, 686 (9th Cir. 2001). "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). To determine whether this standard is met, "a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991).

Here, Hughes was certainly feeling pressure to attend and participate in the C&P exam. However, that pressure was not coming from any action taken by law enforcement but from his own fear that he would lose nearly 80% of his monthly benefits. McCutcheon, who conducted the exam, treated Hughes with respect, and she did not act in a coercive manner in any respect. He was not physically confined, and there was no intimidation involved. The "conduct" of the

government actors involved would not have signaled to a reasonable person that he was unable to leave the exam room.

In fact, Hughes made the choice to attend the exam and even chose its date and time. He did so in order to retain his benefits, not to avoid an unforeseen criminal investigation. And there is no question that the VBA had a legal right[3] to: request that Hughes attend a C&P exam; and, in the absence of his attendance at the exam scheduled, reduce his benefits in light of the evidence it had received that was inconsistent with a 100% disability rating. *See* 38 C.F.R. §§ 3.327(a), 3.655. Hughes argues that his due process rights were implicated by the threatened reduction of benefits, which is true, but the VBA did not fail to adequately safeguard those rights through its administrative processes. *See, e.g., Mathews v. Eldridge*, 424 U.S. 319 (1976). The "free[dom] to leave" does not mean freedom to leave without any consequence. *Mendenhall*, 446 U.S. at 554. In this instance, the consequence of Hughes's leaving would have been the reduction of his benefits, which the VBA was entitled to reduce in the absence of a completed C&P exam, given the evidence it had received of his physical abilities. Moreover, if Hughes wanted to challenge the requirement that he attend a C&P exam in order to

---

[3] Indeed, VBA managerial employee Stuber testified at the hearing that, in her estimation, the VBA had not only a right but a duty to do so once it became aware of the evidence relayed by the OIG.

retain his benefits, he had another option: he could initiate an administrative appeal.

Because the government conduct at issue would not have communicated to a reasonable person the threat of arrest or punishment, and because Hughes chose to attend the C&P exam, there was no seizure triggering suppression. *See Bostick*, 501 U.S. at 439.

### B. Search

Generally, "application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740 (1979). Courts have long applied the two-part *Katz* test to determine whether this threshold is met, asking: first, "whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy'"; and second, "whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as 'reasonable.'" *Id.* (quoting *Katz v. United States*, 389 U.S. at 367 (1967)).

Hughes's argument for suppression fails at the first step of the *Katz* test. He did not display a subjective expectation of privacy. "[A] defendant generally has no privacy interest in that which he voluntarily reveals to a government agent."

*United States v. Wahchumwah*, 710 F.3d 862, 867 (9th Cir. 2013). McCutcheon was a government agent at the time of the exam; she was a government employee conducting the C&P exam at the behest of the VBA and in cooperation with the OIG.

The context of the exam does not alter this analysis. Hughes scheduled the C&P exam for the express purpose of disputing his disability reclassification.[4] He would not have attended the exam had he not expected that his responses, and McCutcheon's assessment of them, would be shared within the VBA in order to adjust his appropriate level of disability. Hughes did not seek medical treatment but instead responded to the questions strictly because he wanted the agency to rely upon his answers.

The conversation during the C&P exam reinforces that the relationship between McCutcheon and Hughes was not akin to a physician/patient relationship. McCutcheon introduced herself as "a family nurse practitioner who's going to do your compensation and pension exam today." (Doc. 67-5 at 2.) She described "the purpose of today's exam [as] to examine you for your service-connected multiple

---

[4] In response to the letter sent by the VBA proposing a reduction in Hughes's disability rating to 70%, Hughes wrote, in full: "I have rescheduled my C&P Exam for the 23rd of January 2018. If this does not stop the proposed rating decision dated 12/18/2017 then I am requesting a hearing to stop the rating decision dated 12/18/2017 reducing my 100% permanent and total rating, due to a called in report of false informatio against me." (Doc. 67-4.)

sclerosis with use of both legs as to preclude natural knee action and loss of use of both hands with urinary incontinence." (Doc. 67-5 at 2–3.) She described the check-box form she was using: "[T]his questionnaire, I don't know if it's the exact same thing you went through in 2008 or not, but its medical questions —a lot of them I can answer just by looking at your medical records and all of that, but some of these, I want to ask you about." (Doc. 67-5 at 5.) She discussed record-keeping within the VA, describing one "claim file that the healthcare providers can't get into" and another "where everybody can see everything." (Doc. 67-5 at 25–26.). She also described the administrative appeal process and her role within it. (Doc. 67-5 at 56 ("They give me 30 days to type up my report."); *id.* at 57 ("I've got a lot of records to review for them. And it's part of my job to interpret the records in a language they understand.")).

Hughes had apparently been laboring under a misapprehension that the VBA could not reevaluate his disability after his 2009 rating, and his description of his frustration demonstrates that he knew he that the exam was a piece of an administrative process: "So it's a little frustrating to come back after this many years, after dealing with the VA, you know, not going outside the VA for primary care. My doctor's seen me a gazillion times over the past six years. He sees me

every time I go over there, you know so it's a little frustrating, but I understand it's a bureaucracy and things have to be done a certain way." (Doc. 67-5 at 50.)

The Court recognizes that Hughes closed the door to the exam room and that McCutcheon and Hughes discussed some sensitive topics during the C&P exam, suggesting that Hughes did not expect that his conversation with McCutcheon would be shared freely. However, the test is not whether a defendant would expect or welcome law enforcement surveillance; if it were, the first step of the *Katz* test would always be satisfied. It is enough that, upon conclusion of the exam, Hughes expected McCutcheon to share the results of the questionnaire with government actors who were not involved in providing medical treatment to Hughes but instead in assessing his disability to ensure the appropriate provision of benefits.

In any event, even if Hughes had displayed a subjective expectation of privacy, that expectation would, under the circumstances, be unreasonable. An ordinary person in Hughes's shoes would not have expected communications made to a medical provider during a C&P exam to be kept private or to be used only for medical care and treatment. In large part, the C&P exam followed the form of the multiple sclerosis questionnaire, and the communications between McCutcheon and Hughes were no more private than the completed questionnaire itself.

The use of audio and video recording technology does not alter the equation. A defendant "cannot reasonably argue that [a] recording violates his legitimate privacy interest when it reveals no more than what was already visible to the agent." *Wahchumwah*, 710 F.3d at 867. "If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks." *United States v. White*, 401 U.S. 745, 751 (1971). Because Agents Huntoon and Munn recorded only Hughes's C&P exam conducted by McCutcheon, who consented to the recording, the audio and video recordings are admissible.[5]

Hughes discusses at length the regulations governing information-sharing within and between VA organizations. However, the issue here is not whether the

---

[5] Because the Court finds that there was no Fourth Amendment violation, it does not reach the government's argument that McCutcheon was under no obligation to comply with the Fourth Amendment. That said, the Court notes that it is wary of the claim that the Fourth Amendment did not apply to McCutcheon because she did not conduct the exam for the purpose of furthering a criminal investigation. First, Agents Huntoon and Munn themselves set up the recording, so if the recording is an unconstitutional search, it does not matter whether McCutcheon herself violated Hughes's constitutional rights. Second, "the Fourth Amendment applies to the conduct of a government official whether 'the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards.'" *United States v. Attson*, 900 F.2d 1427, 1430 (9th Cir. 1990 (quoting *New Jersey v. T.L.O*, 469 U.S. 733, 739 (1985)).

requirements for a warrant were met but rather whether a warrant was required in the first instance. "[T]he scope of the Fourth Amendment's protections is not measured by reference to agency guidelines and other extra-constitutional matter." *United States v. Guzman-Padilla*, 573 F.3d 865, 890 (9th Cir. 2009). Even if it were, "suppression is not the appropriate remedy for failure to follow agency regulations." *United States v. Hinton*, 222 F.3d 664, 674 (9th Cir. 2000).

Because Hughes has not established a violation of his Fourth Amendment rights, evidence from the January 23, 2018 C&P exam, including the video and audio recordings captured by Agents Huntoon and Munn, will not be suppressed.

## II. Motion to Suppress Statements based on *Miranda* (Doc. 65)

The question remains whether Hughes's responses to McCutcheon's questions must be suppressed. Hughes argues that his statements made during the C&P exam are excludable because: (1) he did not receive a *Miranda* warning, and (2) his statements were involuntary and therefore elicited in violation of his due process rights.

### A. *Miranda*

Hughes contends that the failure to administer a *Miranda* warning prior to the C&P exam renders inadmissible his statements made during the exam. Under *Miranda*, a suspect is entitled to receive a warning prior to custodial interrogation

-14-

in order to adequately safeguard an individual's Fifth Amendment to avoid self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). A government agent must give a *Miranda* warning when an individual is: (1) placed into custody; and (2) interrogated. Here, Hughes was not entitled to a *Miranda* warning because, even assuming that McCutcheon "interrogated" him when she asked him the questions on her check-box form, he was not in custody at the time of the C&P exam.

"[C]ourts have generally held that government agents not primarily charged with enforcement of the criminal law"—like McCutcheon—"are under no obligation to comply with *Miranda*." *United States v. Eide*, 875 F.2d 1429, 1434 (9th Cir. 1989). However, under certain circumstances, a government agent other than a law enforcement officer may have a duty to administer a *Miranda* warning. *See Estelle v. Smith*, 451 U.S. 454 (1981).

In this instance, McCutcheon had no such duty because the C&P exam was administered in a noncustodial environment. "[I]n-custody determinations must be 'based on the totality of the circumstances' and are reviewed according to whether 'a reasonable person in such circumstances would conclude after brief questioning [that] he or she would not be free to leave[.]'" *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001) (quoting *United States v. Beraun-Panez*, 812 F.2d 578,

580 (9th Cir. 1987)). "The following factors are pertinent . . . : '(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual.'" *United States v. Barnes*, 713 F.2d 1200, 1204 (9th Cir. 2013) (quoting *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002)).

The Court's earlier discussion of whether Hughes was seized within the meaning of the Fourth Amendment carries over substantially into the custody determination. Hughes attended the C&P exam voluntarily and for the purpose of retaining benefits, and he was accordingly not in custody. The five-factor analysis specifically applied in the context of *Miranda* underlines the noncustodial nature of the exam.

First, the "language used to summon Hughes"—a standard-form letter from the VBA stating that, due to evidence received, which was unrebutted by the C&P exam Hughes scheduled but did not attend—was not coercive. *Id.* As explained at some length above, *see supra* p. 7–9, Hughes appeared "voluntarily," even though he was understandably concerned that failure to do so would create adverse consequences. *Id.* Second, Hughes was not "confronted with evidence of guilt"; McCutcheon made no suggestion that Hughes had done anything wrong. *Id.*

Third, the room in which the exam took place was not an intimidating setting but a basic medical exam room; Hughes was free to leave at any time, and he personally closed the door prior to the exam. *Id.* Fourth, the "detention" was relatively short in duration; McCutcheon asked some routine questions to ensure Hughes's safety and well-being and then followed the same check-box questionnaire used by all providers assessing veterans' level of disability attributable to multiple sclerosis. *Id.* Fifth and finally, there was absolutely "no pressure applied to detain" Hughes, who traveled to and from the exam himself. *Id.*

Because Hughes attended the exam voluntarily and was free to leave on his own terms, was not "faced with a phase of the adversary system." *Estelle*, 451 U.S. at 467. Thus, he was not entitled to a *Miranda* warning.

### B. Voluntariness

Finally, Hughes argues that his responses to McCutcheon during the C&P exam should be suppressed because they were made involuntarily. "[A] defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession . . . ." *Jackson v. Denno*, 378 U.S. 368, 376 (1964).

A determination of voluntariness requires an "assess[ment of] the totality of all the surrounding circumstances—both the characteristics of the accused and the

-17-

details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Relevant factors include: "the youth of the accused"; "his lack of education"; "his low intelligence"; "the lack of any advice to the accused of his constitutional rights"; "the length of detention"; "the repeated and prolonged nature of the questioning"; "and the use of physical punishment such as the deprivation of food or sleep." *Id.*

Under the circumstances presented here, the Court cannot conclude that "the government obtained [Hughes's] statement by physical or psychological coercion or by improper inducement so that [Hughes's] will was overborne." *United States v. Fisher*, 137 F.3d 1158, 1165 (9th Cir. 1998) (quoting *Derrick v. Peterson*, 924 F.2d 813, 817 (9th Cir. 1990)). Hughes was 45 years old in early 2018; although the Court is unaware of his level of education, he apparently has a successful military background and a strong understanding of VA administrative processes; at minimum, he does not have a low intelligence; he was made aware at multiple steps of the process of his due process rights to appeal any reduction in benefits; he was not detained for any length of time; the questioning was neither "repeated and prolonged" but routine and quick; and he suffered no physical punishment. *Scheckloth*, 412 U.S. at 226. The Court cannot conclude, then, that Hughes's statements were involuntary or unreliable.

Accordingly, IT IS ORDERED that Defendant John Cicero Hughes's Motion to Suppress Statements Based on *Miranda* (Doc. 65) and Motion to Suppress Evidence from C&P Examination (Doc. 61) are DENIED.

DATED this 27th day of September, 2019.

/s/ Dana L. Christensen
Dana L. Christensen, Chief Judge
United States District Court